Case 14-5220 U.S.A. v. Michael Walli Case 14-5221 U.S.A. v. Megan Rice Case 14-5222 U.S.A. v. Greg Bourget-Aubert Oral argument not to exceed 15 minutes per side Mr. Shapiro for the appellants May it please the Court, Mark Shapiro for the defendants, Sister Megan Rice, Greg Bourget-Aubert, and Michael Walli. I'd like to reserve four minutes for rebuttal. You may. Are you going to do all the talking here? Are your batteries on? I am, Your Honor. Okay. Following the events on July 28, 2012, the defendants were initially charged with trespass and destruction of government property. If the government had stuffed those charges and secured convictions on those counts, we likely would not be here today. If the government had gone one step further and claimed that the defendants' acts of civil disobedience constituted sabotage, that position cannot be squared with the intent of the statute or the case law supporting it. What we have here are a group of senior citizens who favored nuclear disarmament and entered Y-12 with a desire to spread their message of peace. Far from attempting to enter the HEUMF building where the uranium is stored, they stayed outside the building and they engaged in peaceful protest where they sang hymns, they prayed, and when security finally arrived, they broke bread and they read their self-authored statement promoting their mission, their broad goals. Now, what Congress had in mind when it passed 2155 is not, I think everyone can agree, is not the kind of activity that occurred in this case. When we look back at the legislative record, what we see is, going back to the wartime provision that was passed in 1918, is that Congress was concerned about those things that would damage the instrumentalities of our national defense, that they are the war effort, but the rule that we propose, and we think this is what is supported by the legislative history, are 2155 is designed to cover those acts that would render inoperative or defective instrumentalities of the war or national defense. And again, sort of underscoring this point, members of Congress, when they were talking about this issue, they were talking about things like foreign nationals who were working at our factories and manufacturing dummy bullets, manufacturing dummy torpedoes, that there was concern that a bomb may be thrown into a munitions plant. And when we look at the 1918 discussion, what we see is Representative Olsted specifically stating that the act is not intended to cover slight injuries to any of these things. It's intended to cover those things that are more severe. We look to, for example, the, I'd say, slight versus large distinction here. If you blow up one skid of shells as opposed to blowing up a carload of shells, that sort of thing. And how do you square that with Kabat and Platt, despite the chit-chatting there? There really wasn't a whole lot of fuss caused by that either. Right. No, I think that's right. Our position with respect to the Platt case and the Kabat case is that there are two things that make those cases stand out. Certainly in the Kabat case, there were instruments that were brought in, there was a jackhammer that was brought in, and there was some indication that the jury could conclude that there was actually a desire to cause serious damage to the missile silo that was at issue there. The Kabat, or I think it's Kabat. I'm not sure. Was that a missile facility as well? I can't remember. Yes, they both were missile facilities. And the second point that we make about those cases is that, unlike Y-12, which is a manufacturing facility, we understand that it is important, but it is a manufacturing facility. Those missile silos have to be ready to respond within a matter of minutes in the event of a threat to the United States. And so a diversion of resources there, the presence of individuals alone at those facilities, could in fact, and may very well, in the event that such an alarm sounded, prevent the facility from doing what it needs to do, which is engage in a sort of first-line defense. Whereas Y-12, as a manufacturing facility, is certainly engaging in important work, but there's no sense of immediacy that occurs at Y-12. So is that a general line drawing? I mean, you can imagine that they managed to turn the knob that flooded the basement, so it put it out of action for quite a long time. But of course, you know, we still have a fair amount of bombs, so the uranium wouldn't cause much trouble. Is that a distinction, that it's not immediate? Well, I do think at some point, we would acknowledge at some point that the interference is intended to be so great that it would render the facility inoperative for a prolonged period of time or take the uranium that is there out of operation. The phrase in the statute, isn't it, is obstruct, disrupt, or there's a third word, injure national defense activities. Right. It doesn't say a whole lot or not too much, because my shell example, suppose you blow up a carload of shells, but all the government has to do is put on an extra ship. They're still going to get shells to the front. Would they still not be liable if it really doesn't injure it very much? I don't think we need to wrestle with those sort of hypotheticals in this case, because I think that's a case that's closer to the military tribunal cases where you can say, look, when you take one jet out of operation, of course the United States has many, many, many more jets, and courts have gone different ways on those issues. But our contention is that those cases are completely different. Here, there wasn't even... Well, when you say the jets, isn't that the one where he did what he did because he wanted to get out of duty? He didn't have any bad feelings toward the military. Here, your clients did specifically say that they hoped and intended to disrupt, to keep the new facility from being built. Now, there may be very little chance of it, although in the end they created more disruption than they thought in terms of pulling a lot of security from all over. But the intent, as I read it, was there. It may have been a futile attempt or a foolish intent, but that was their intent. This is our point about there having to be some real nexus between the events that occur and the intent. We think that is much more closely aligned with motive than it is intent. Certainly, it's... This is where the district court went with this issue. It said that their desire to stop the production of the facility would, in fact, constitute intent. We looked at the standard that exists in those military tribunal cases, inevitable result, foreseeability, and we know that the only thing that you can say that is inevitable or would be foreseeable by these individuals is that they may interfere with the facility for a matter of hours. That is what I think everybody expected. I don't think, on this point, you are kind of blending two different ways of determining intent, right? I mean, you can say something is intended and it's practically certain to resolve, or if there's evidence that they actually subjectively intended that result. Isn't that... Aren't those two different ways of finding intent? Well, certainly, but I think there are two different ways of finding intent. So, I mean... Okay, but you were describing it as if only the fact was certain. I think you have to look at... When you look at subjective intent, though, you say, could there actually be a legitimate basis that they genuinely... I mean, little hammers are going to destroy this. Although, for example, they probably did not know, what I read from the record, that there was this shipment coming in which got disrupted in the sense that not only did it not get there, but they had to park it somewhere, which is not a thing you like to do with enriched uranium. Sure. The disruption that you create does have ripples. Absolutely, and I think that... In fact, that was a disruption that they caused, which was part of their intent, wasn't it? But I don't think there's any dispute that they could not have foreseen that that shipment was coming in, that they would shut down this facility for more than a matter of hours. In fact, I think that when you look at the record in this case, it came as a surprise to everybody, including the individuals that worked at the facility, that the security protocols that were supposed to be in place were obviously extremely flawed. You see the testimony in the case that nobody expected that a group of senior citizens would be able to cut through not one, not two, not three, not four fences, and then actually end up at this building. What you would expect is them to be stopped, them to be taken away, them to do what they wanted to do, which is spread this message, educate the employees at Y-12. And I think, Judge Kaplan, this gets to your point. What was their subjective intent? Their subjective intent is to spread this message, to educate Y-12 employees about the pitfalls of nuclear weapons. And beyond that, I think we have to look to what is the inevitable result? What could you expect would happen? And that's when we start to get into the secondary standard of intent and say, look, nobody would have expected that they, in fact, would have brought an end to the use of nuclear weapons or, even more minimally, stopped the production of a facility. Your argument is they may well have wanted to bring about the ultimate elimination of the United States nuclear arsenal. But the question in this case is when they uncurl the banners and they take the little hammers and they're hitting the corner of the building, breaking the bed rather than swinging the hammers, and spattering blood and doing stuff that I would say is dangerous, did they intend, by doing those things, to eliminate the nuclear arsenal? Approximately, I guess you could say. I think that's an accurate characterization. And our contention is there's no possible way that anybody could intend for them to, through their actions, the only way that could occur would be through some groundswell of support that is created in the months and years that follow. But they don't have to eliminate the whole nuclear arsenal to disrupt and obscure and obstruct the national defense activity, right? Well, again, I think that gets to... This is a line drawing between a tiny effect and a bigger effect in the military. And that gets to the point that we were making about what was the congressional intent with this statute. They recognize that there may be some injuries that would occur, but slight injuries, even to national defense facilities, are not going to be covered under this provision. And so that's why we suggest that here, you're not even talking about... You're talking about perhaps a slight injury, the cutting of the fences, the writing on the walls, the banners, these sorts of things, but... Not knocking big chunks out of the wall. Yeah, so there was a chunk that was taking... A pretty big chunk. I don't know. We got a size of how big it was. Certainly. There was that. But I don't think anybody believed that that was anything more than a symbolic act, although it may have been damage. I see that my time is up. Any other questions? Thank you, Kevin, for your time. May it please the Court. Good morning, Your Honors. My name is Jeffrey Theodore. I represent the United States in this matter. Your Honors, there is sufficient evidence in this case to sustain the conviction for 18 Isaias Coast, Section 2155A, which has been referred to as a sabotage count. There are two elements to that. Only one is being disputed by the defendants in this case, and that's the intent of the conviction. We have to prove that the defendants intended to interfere with, injure, or obstruct the national defense. So interference with the national defense is sufficient. When you look at all the evidence in this case, when you look at the actions of the defendants, they surreptitiously came onto the grounds of Y-12, penetrated a perimeter fence, went through a high-security, what I would refer to as a pied-out fence, a very high-security fence with sensors, cut through three of those, went to the highly-enriched arranged materials facility building, targeted that, which they said they were targeting that particular building, left banners of hand-wrapped ball, left an indictment there. They drafted an indictment indicting Y-12 and the U.S. government for war crimes, for... I'm sorry? Well, that's also a theme to an extent. I mean, they have general disarmament ideas. They want to disarm nuclear weapons. But, of course, we have more than that here. We don't have a situation where we're... It's just a situation of protesters where people have the desire, the intent to disarm, and then taking action in furthers of that. Do you recognize the distinction that opposing counsel makes between motive and intent? Is that a fair distinction in the law? You know, somebody... A man kills his spouse because he wants to get... He's a beneficiary of the life insurance policy. He does it because he wants money. His intent in shooting her is to kill her, right? Those are two different things. I mean, would you agree that those are two different concepts? I agree there's a difference to an extent. I don't agree with the defendant's characterization that this is simply a matter of motive. And I don't believe that the Botts case, which they rely upon, says a motive of disarmament, the purpose... I'm sorry, saving innocent lives in that case is a little bit different. They said that's not relevant because it doesn't negate intent. Let's look at some of the particulars of what they do. How big were these hammers? Approximately about a foot. Just like a regular hammer, kind of? Approximately. One was a little larger than that. Okay, so when they're hammering on the corner of the building, do they have the intent? Do they have the intent to injure the national defense when they do that? I believe that they knew that by going in there and causing the damage that they did... I'm just talking about hitting the... We're about to talk about putting up a banner. When they do that, I mean, is that intended to injure the national defense? Well, I think their intent in going in there was to disrupt the activities of Whitewood, disrupt the operations, and that's why they went there. Their... Counsel, how does that accomplish at that time of day, in the early hours of Saturday morning, with common home tools? How does that accomplish the damages that, as I understand it, amounted to about $8,500 in labor and materials? I understand the restitution order was just short of $53,000, but that was just for additional shifts to cover the holes in the fences, right? Correct. So the damage to this large facility, this, I assume, multimillion-dollar facility, was simply $8,500 in materials and labor at a time when no one was actually working at the facility. Isn't that right? I think, Your Honor, that they could have reasonably foreseen, and the jury could have found, they could have reasonably foreseen at doing what they did. And I think... The test is practically certain, though, for attack. Yes. This isn't just a reasonable foreseeability we're talking averages. Right. We need specific attack. I believe that it would be practically certain that it's certainly there. Practically certain that, I mean, that, you know, the shipment's coming that day, that it's actually going to shut things down for two days when they're going in there with banners. Not that part, as far as that, but as far as knowing that they went into an extremely sensitive area, very sensitive area, they knew there would be a very, very strong, substantial institutional response that would disrupt operations. I mean, more certain that they were going to get shot than they were going to hold things up for two weeks. Well, even to accept that would be a substantial disruption, even if that hadn't occurred. Fortunately, it did occur. But even that would... To get back to the Cienter issue, though, their intent to disarm nuclear weapons, we would submit it's just not a matter of motive. That is part of their overall Cienter, and that was argued to the jury. That was part of their purpose, their intent, their goal. Now, you know, there's a certain amount of semantics here, but that was all part of their Cienter here. Let me ask you a question. Let's say somebody is an adamant nuclear disarmament proponent, and the same day that the shipment was coming in, let's say this incident doesn't happen, that shipment's coming, and let's say there's 20 of these people. I'm sorry, 20 people that are just adamant anti-nuclear weapons people, and they lay down in front of you on the same day the shipment's coming, and, you know, because of incompetence similar to that which allowed these folks to get in so far, it takes an inordinately long time to remove these people from the gate, and the shipment, it can't stay there, so it has to go back four states away and return to a secure facility. Could you prosecute those folks for sabotage? I don't think you would meet the second element of the offense, because that's what I think provides the... The second element would be what? I'm sorry, that they intended to injure national defense practices. I mean, if they're trying to keep nuclear material from getting to the nuclear facility, wouldn't that be exactly obstructing and interfering with? Well, I think you probably could possibly could have the intent element, the specific intent element, but the other element is they have to willfully attempt to injure national defense premises, and that is... Oh, yeah, I guess I took this hypothetical that they are already inside the premises. Sure. They're inside the moat. Well, or just, you know, there's a lot of these places where it's a public road that then becomes secure further in, but you're still on the premises. Under those circumstances, and if they had indicated their intent, which was so thoroughly expressed by that, both in out-of-court statements and at trial, that they intended to affect the operations at the facility for the purpose of nuclear disarmament, they wanted to disrupt nuclear weapons production. So under that scenario that you presented, I believe that... The premises part may make it different, but haven't there, in fact, been... It's a long, long time ago, but where people would lie down in front of the trains that were taking weapons from point A to point B, if there was a premises, would you say that was an intent to obstruct and interfere? I think they could, but I think, again, that's the limiting principle that guides us here, is there are two elements. You have to have both of the elements. And without, you know, people... And I made it clear to the jury, they have all the right in the world to be against nuclear weapons, and they've all the right in the world to protest nuclear weapons. But when you combine that intent to disarm with them taking action against it and trying to interfere with nuclear weapons production, and there was a lot of evidence in the trial as to how critical Whitehall is to our national defense. Those missile... Those military bases in Plattey and... Kibat? Those... Yeah, I was standing on top of a silo of doors that have to open, and, you know, I suppose the missiles can go through anyway, but, you know, that's... That is different. I mean, what's lacking here in one sense is a sense of proximate, you know, effect on the national defense and substantiality. It's de minimis. At least what they can be said to have practically... No one was going to happen to be de minimis. And the effect upon the national defense is a lot more indirect. It is more indirect than it was in Plattey. I mean, that's fair, isn't it? This is not a missile facility that has to react in 15 minutes to the President directly. Correct. I think the harm, though, is just as great. And I think that immediacy requirement, essentially, that defense are arguing, that it has to be first-line of defense, believe that that goes against the plain language of the statute. I don't believe that's a valid argument for two reasons. First, if you look at the definition of national defense premises in 18 United States Code Section 2151, which is incorporated in the sabotage statute, that statute, the definition of national defense premises, has a last clause there, which talks about... and basically military establishments and installations of the armed forces. That clause refers to military. Everything above that refers to things that are certainly complex, not military. Their first-line of defense argument presupposes, but if it's first-line of defense, it's got to be military. I mean, what else is going to be first-line of defense, not military? And I believe that goes against the plain language of primary theory. There seems to be an uncanny parallel between this case and the Bond case in the Supreme Court. I mean, there, the language couldn't have been clearer, as Justice Scalia argues in his concurrence. And yet, the Supreme Court says, you know what? We're not going to read chemical weapons as broadly as even the defined term of chemicals, basically anything harmful, would mean. And they said, when used in the manner here, the chemicals in this case are not the sort that an ordinary person would associate with instruments of chemical warfare. And by analogous reasoning, I mean, isn't it fair to say that the instruments here, you know, hammers, bread, banners, spray paint, and blood, that's about it. The instruments here, those are instruments of injury and national defense. It certainly could be, Your Honor. Absolutely. The key is... I'm not talking could be. These folks are in prison right now. So in this case, on this record, isn't it as far-fetched, and as, when you talk about the district court's hypo, it's about, you know, the football game, throwing back and forth. Aren't the ramifications as sweeping as those in Bond? So that, as Chief Justice Roberts did in the majority of the court of access, maybe we ought to step back from an interpretation of the national defense that is so eggshell that hanging banners and this sort of thing constitutes sabotage in this country. Your Honor, I don't think it has the same thing. First of all, the Supreme Court has defined national defense, and says it's broad. In a different statute. Different statute, but I don't think, I don't believe that would make a difference. And I believe the purposes would be the same. And they have defined national defense. They've defined it broadly, related to activities of national preparedness. The history of the national defense is really good. Intent to injure. Or interfere with. Or interfere with. Intent to interfere with. With a lot of people. Your Honor, I don't think there's the same concern here, because I think, or they have cited Yates. They didn't make a statute of obstruction argument. They never objected to the jury instructions and the obstruction by the judge. But that's, I don't think there's the same concern here, because you don't have, you have the best evidence is what did Congress, what language did Congress use? And Congress's language, I mean, if Yates was to stand for that, the statute should never be interpreted broadly. What did Congress intend? In this case, when you look at 2155 and national defense premises, and you look at 2151, that suggests, because 2151's very broad, it suggests this to be interpreted broadly, and then that squares perfectly with what the Supreme Court stated in Gordon. National defense has broad connotations related to activities of national preparedness, and Y-12 absolutely is critical to our national defense. It is absolutely critical, what they do. There wouldn't be nuclear weapons, we would not have a nuclear deterrent for our national defense without Y-12. Your Honor, I don't think that whole, I think that they intend, also in the Ortiz case, that's actually a companion case of the Ortiz case cited by the defense in their brief. They talked about a statute should be interpreted in a way that will accomplish its purpose. The legislative purpose of this statute. The Ortiz ended up getting convicted after the remand, didn't he? I believe so, but I'm not sure. The first opinion where they said go back and get a better intent, and then they were able to on remand, my impression. Yes. The court did, I see my time's up, I'm going to have to continue here. The court there said that the real purpose in analyzing it is what purpose was Congress intending to accomplish with it. And the legislative purpose of 2155 was to make sure that the military establishment is prepared to respond to aggression, prepared for that. And that... It takes a long time to get Y-12 bonds. Okay. I think your time's expired. Thank you, Your Honor. Thank you. Mr. Carroll, let me ask you a quick question to you that really... To me, you've got a very good case where de minimis effect was used. But is that enough to take it out of the statute? And let me give you my hypothetical. You've got a base in Leavenworth, Kansas. It's not on the front line, but it's got a lot of soldiers. And people know that war is not healthy for children and other living things. And I think we shouldn't have a military. And I want to show people I do what I intend for the military to get healthy. So I put some mild poison in the food, and so 30 soldiers get sick on the facility. Have I obstructed and interfered with the national defense? Well, I... Obviously, that's... Obviously, you've got 30 more soldiers. It's in Leavenworth. It's de minimis. It's a protest. But doesn't that interfere with and obstruct the national defense? Well, again, I think we have to look to congressional intent and say, okay, well, is this statement or is it not? I think, obviously, there, we have to look at the circumstances. I mean, if the poison is intended to take these individuals out of operation, then you're much closer to these military tribunal cases where you say, well, is there an instrumentality? And the instrumentality there would be the individuals themselves. There's one jet plane, right? Right. It's a crusader. The guy gets busted for this crime, right, in that case? Right. For... Sorry, in which case? Wasn't there that military court appeals case where the guy throws... Oh, yes. Right. He's the one that attends to get out of going to the meds. Right. Yeah, different... It was more like a red boat killing your wife. Right, right. And there's a few of those cases, and I think the court... And in Ortiz, in the end, he gets convicted. Right. Two opinions in Ortiz, right? Yes, that's exactly right. I think the court on appeal expresses some reservation about whether or not he should have been convicted. And then on remand, you're right, there's Boggs. And they ask for more intent, and they have the same kind of thing, which is, well, you know, it's an F-35 and it's up in Alaska, and maybe we need more, but if you look at it, if you want to make the same kind of argument, you can say, we have lots of F-35s, and they're armed as well. Well, and I think that there, you have individuals who know full well, I mean, these are airmen. They know exactly what is going to result from their actions, that when you throw some tools and a jet is supposed to start up, it's going to ground that jet. Whereas here, you have individuals who I think, and this gets back to your point, Judge Ketledge, I think that Bond and Yates are directly on point here. And I would note that this case comes up in precisely the same posture as Yates, which the claim there at the 11th Circuit was an appeal from the denial of a Rule 29 motion and a sufficiency of the evidence claim, where the inquiry was, look, common sense, what is it that was intended to be captured by this statute? In Yates,   In Bond, we're talking about chemical weapons. And I think that any reasonable person looking at the statute, looking at what constitutes sabotage, looking at what constitutes sabotage, would say, a group of individuals who walk into a facility, and I would note, although the government says they intended, they did so surreptitiously, the whole point of all of this, and I don't think there's any dispute about this, is that they would be exposed. They wanted to spread their message. The government acknowledges that they read this self-authored indictment. They brought that to be exposed to read to these employees. And so, while they may have gotten in surreptitiously, they were not trying to dilute the uranium and not get caught waiting to see what might happen afterwards. They desired to spread a message. And that was truly their desire. So is surreptitiousness really, I mean, does that, non-surreptitiousness, I mean, lots of people do things, and then, you know, they blow themselves up. Do they intend for that to be the end of it? It's not surreptitious at all, but depending on what else they've done. Well, I think the courts in those cases are saying, look, did you want to accomplish your goal? Did you want to take that jet out of, really want to take that jet out of commission? In my soldiers case, you would say, yes, you did intend to take those soldiers out of commission, even if it's de minimis. Well, if you did so surreptitiously, I think there is, I think there's a much closer case, obviously, Judge Fox. I'm assuming once they did it, they would say, ah-ha, war makes people sick. Well, that may be the case. I don't know how they would react in that situation, whether they would laugh about it or not, but the point is, is that in these military tribunal cases, the question is, did they do so in front of others? And Johnson, the court said, he did so, others knew what he was doing. He obviously didn't intend to get caught. Here, I think we can say that they intended to be exposed. That was their very purpose, and it wasn't to poison anything. Providing the plan also, they intended to be exposed. Right, but we have the distinguishing feature that Judge Kethledge has recognized, and I think that the concern, the impact, the proximity to impact on the national defense there is much closer than it is here. For those reasons, we would ask that this court reverse those sabotage convictions and remand to the district court for a new sentence. That case will be submitted. We're going to call the next case.